## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| **KIRT ROTHE, CATHERINE PLASTER,** individually, and on behalf of all others similarly situated, )<br><br>**Plaintiffs,** )<br><br>**v.** )<br><br>**FCA US LLC,** a Delaware limited liability company; **FIAT CHRYSLER AUTOMOBILES N.V.,** a corporation organized under the laws of the Netherlands; **ROBERT BOSCH GMBH,** corporation organized under the laws of Germany; and **ROBERT BOSCH LLC,** a Delaware limited liability company,<br><br>**Defendants.** | **Case No.:** 2:17-cv-32<br><br><br>**CLASS ACTION COMPLAINT AND COMPLAINT FOR DAMAGES**<br>**(Demand for Jury Trial)** |

_____

## CLASS ACTION COMPLAINT AND COMPLAINT FOR DAMAGES

Plaintiffs Kirt Rothe and Catherine Plaster, acting on behalf of themselves and all others similarly situated, bring this action for damages and equitable relief against Defendants FCA US LLC and Fiat Chrysler Automobiles N.V. (collectively, "Fiat Chrysler" or "Fiat") and Defendants Robert Bosch GmbH and Robert Bosch LLC (together, "Bosch").

1.       Climate change and health hazards caused by air pollution are two of the most pressing concerns for the survival of life on earth. They are global problems and global worries. Almost everything these days is looked at for its "green" potential and its possible contribution to emissions and climate change. People are concerned.

2.       Fiat Chrysler Automobiles N.V., one of the world's largest automakers, and all of its subsidiaries, including FCA US LLC (formerly known as Chrysler Group, LLC), and Bosch,

the world's leading vehicle emissions software and hardware designer and manufacturer, jointly manipulated that concern and duped many consumers who were trying to make eco-friendly choices into buying light trucks that were, in fact, emitting significant levels of environmental pollutants every day.

3.      The vehicles that are the subject of this case use the 3.0 liter "EcoDiesel" engine designed by VM Motor, a wholly-owned subsidiary of Fiat Chrysler Automobiles, N.V. That engine is an option in Fiat Chrysler vehicles, including certain 2014-2016 Jeep Grand Cherokees and Dodge Ram 1500 trucks sold in the United States.

4.      Fiat Chrysler Automobiles N.V. and its subsidiaries misleadingly marketed these vehicles as "EcoDiesels"—supposedly "cleaner than gas vehicles." In reality, the vehicles produce harmful pollutants in excess of Georgia and national emissions standards, as well as in excess of what a reasonable consumer would expect from an "eco" vehicle. To add insult to injury, Fiat charged *more* for these defective trucks and SUVs than its other competing models. The upcharge gave consumers the false impression that they were investing in clean emissions and environmental responsibility when, in fact, the opposite was true.

5.      Plaintiffs Kirt Rothe and Catherine Plaster, on behalf of themselves and a class of Georgia residents who purchased or leased Class Vehicles ("Class Members"), as well as on behalf of a nationwide RICO class, bring this action to redress Fiat Chrysler's and Bosch's unfair business practices and fraudulent misrepresentations about the emissions compliance and general environmental-friendliness of more than 100,000 U.S. vehicles in the 2014 to 2016 model years.

6.      Since at least 2014, Fiat and Bosch have collaborated to create and use specially-developed devices and software to evade complying with United States emissions standards for certain models of Fiat's diesel vehicles. These tools are designed to fool testing devices and

conceal the fact that certain Fiat models emitted nitrogen oxides ("NOx") at levels much higher than what was legally permitted under normal driving conditions. NOx is a known hazardous pollutant and greenhouse gas, and has been linked to numerous debilitating respiratory diseases.

7.     More specifically, Fiat Chrysler included in its "EcoDiesel" vehicles several Auxiliary Emissions Control Devices (AECDs)—devices that "reduce the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use" (40 C.F.R. § 86.1803-01)—that were designed to significantly reduce the efficacy of the NOx reduction systems during real world driving conditions. Although required by both state and federal law to disclose to regulatory agencies any AECDs in its vehicles, Fiat Chrysler made no such disclosures. Much like the Volkswagen diesel vehicles that have been the subject of an international scandal and much litigation, this resulted in vehicles producing compliant levels of emissions during testing conditions while spewing pollutants during everyday use. This allowed Fiat Chrysler to conceal the vehicles' true NOx emissions levels and dupe both regulators and consumers.

8.     As part of Fiat Chrysler's media campaign designed to capitalize on public concern over climate change, Fiat Chrysler bombarded the TV airwaves, the Internet, and print with advertisements that misleadingly touted the fuel economy, power, and "green" credentials of Fiat Chrysler's supposedly "clean" EcoDiesel vehicles. Fiat Chrysler claimed that the vehicles met or exceeded federal emissions standards when they did not and Fiat Chrysler knew they did not. Instead, the vehicles were built with sophisticated software designed to cheat environmental pollution standards.

9.      Fiat Chrysler's scheme went undetected for at least two years, and might have continued unabated had the Volkswagen emissions scandal not come to light. In the wake of the Volkswagen emissions scandal, regulators looked at all diesel vehicles with heightened scrutiny.

10.      On January 12, 2017, the Environmental Protection Agency (EPA) issued a Notice of Violation for Model Year 2014-2016 diesel light-duty vehicles (Dodge Ram and Jeep Grand Cherokee) (the "NOV"). The NOV identified eight AECDs that had not been disclosed by Fiat Chrysler and stated that those AECDs, either alone or in some combination, functioned as a "defeat device":

> Operation of one or more of the eight undisclosed AECDs, either alone or in combination with each other, results in excess emissions of nitrogen oxides (NOx) under various operating conditions that may reasonably be expected to be encountered in normal vehicle operation and use.

> EPA Notice of Violation dated January 12, 2017.

11.      On the same day, the California Air Resources Board ("CARB") issued a Notice of Violation to the same entities relating to the AECDs in their 3.0 liter "EcoDiesel" vehicles.

12.      The chart below indicates which vehicles (the "Class Vehicles") have been impacted by Fiat Chrysler's deliberate deception. Additional investigation may lead to the discovery of other models and years impacted by the deceptive scheme.

| Model Year | EPA Test Group | Make and Model (s) |
|---|---|---|
| 2014 | ECRXT03.05PV | Dodge Ram 1500 |
| 2014 | ECRXT03.05PV | Jeep Grand Cherokee |
| 2015 | FCRXT03.05PV | Dodge Ram 1500 |
| 2015 | FCRXT03.05PV | Jeep Grand Cherokee |
| 2016 | GCRXT03.05PV | Dodge Ram 1500 |
| 2016 | GCRXT03.05PV | Jeep Grand Cherokee |

13.    Every Class Vehicle was sold to consumers based on knowingly false representations about its true environmental friendliness, fuel efficiency, and performance ability, as a result of Fiat's and Bosch's illegal conduct.

14.    Plaintiffs and Class members were induced to purchase Class Vehicles based on deliberate misrepresentations and omissions by Fiat Chrysler in its advertising, public statements, and marketing information. These were material factors in inducing Plaintiffs and Class Members to purchase the Class Vehicles. Fiat Chrysler's deceptive scheme caused many consumers worldwide to buy the Class Vehicles based on false claims of the vehicle's characteristics. Plaintiffs and Class Members would not have purchased or leased the Class Vehicles or would have paid much less had they known the truth about them.

## THE PARTIES

### Plaintiff Kirt Rothe

15.    In April 2015, Plaintiff Kirt Rothe purchased a Model Year 2015 Ram 1500 SLT model 2WD with 3.0L "EcoDiesel" engine. Kirt purchased the Dodge Ram specifically because it was advertised as being a "clean," environmentally-friendly vehicle that also provided excellent power, performance, and fuel mileage. Kirt researched both the Ram and competing trucks before choosing the Dodge Ram. Kirt would not have purchased the Dodge Ram but for Fiat Chrysler's representations regarding its "clean" emissions characteristics.

### Plaintiff Catherine Plaster

16.    In August 2015, Plaintiff Catherine Plaster purchased a Model Year 2015 Jeep Grand Cherokee Laredo 4X2 with the 3.8 liter "EcoDiesel" engine. Catherine purchased the Jeep specifically because it was advertised as being a "clean," environmentally-friendly vehicle that also provided excellent power, performance, and fuel mileage. Catherine researched both the

Jeep Grand Cherokee and competing SUVs before choosing the Jeep Grand Cherokee. Catherine would not have purchased the Jeep Grand Cherokee but for Fiat Chrysler's representations regarding its "clean" emissions characteristics.

**The Fiat Chrysler defendants**

17.    Defendant FCA US LLC ("FCA") is an American automotive limited liability company. It is organized under the laws of Delaware with its principal place of business and headquarters in Auburn Hills, Michigan. FCA is wholly owned by Defendant Fiat Chrysler Automobiles N.V., a holding company. Until the end of 2014, FCA went by the name Chrysler Group, LLC.

18.    Defendant Fiat Chrysler Automobiles N.V. is a Dutch corporation headquartered in London, United Kingdom. FCA and Fiat Chrysler Automobiles N.V. are collectively referred to as "Fiat Chrysler" or "Fiat."

19.    Fiat Chrysler is a motor vehicle manufacturer and a licensed distributor of new Chrysler, Dodge, Jeep, and Ram vehicles. The Chrysler brand is one of the "Big Three" American automobile brands. Fiat

**Fiat Chrysler locations in North America**



Chrysler engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands. Other major divisions of Fiat include Mopar, its automotive parts and accessories division, and SRT, its performance automobile division. As of 2015, Fiat Chrysler is the seventh largest automaker in the world by unit production.

20.    Fiat Chrysler, through its various entities, designs, manufactures, markets, distributes, and sells automobiles in Georgia and multiple other locations in the U.S. and worldwide. Fiat Chrysler and/or its agents designed, manufactured, and installed the EcoDiesel engine systems in the Class Vehicles. Fiat Chrysler also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

**The Bosch Defendants**

21.    Defendant Robert Bosch GmbH is a German multinational engineering and electronics company headquartered in Gerlingen, Germany. Robert Bosch GmbH is the parent company of Robert Bosch LLC. Robert Bosch GmbH, directly and/or through its North-American subsidiary Robert Bosch LLC, at all material times, designed, manufactured, and supplied elements of the defeat device to Fiat Chrysler for use in the Class Vehicles. Bosch GmbH is subject to the personal jurisdiction of this Court because it has availed itself of the laws of the United States through its management and control over Bosch, LLC, and over the design, development, manufacture, distribution, testing, and sale of many thousands of the defeat devices installed in the Class Vehicles sold or leased in the U.S.

22.    Defendant Robert Bosch LLC is a Delaware limited liability company with its principal place of business located at 38000 Hills Tech Drive, Farmington Hills, Michigan

48331. Robert Bosch LLC is a wholly-owned subsidiary of Robert Bosch GmbH. Robert Bosch LLC, directly and/or in conjunction with its parent Robert Bosch GmbH, at all material times, designed, manufactured, and supplied elements of the defeat device to Fiat Chrysler for use in the Class Vehicles.

23.     Both Robert Bosch GmbH and Robert Bosch LLC (collectively "Bosch" or the "Bosch Defendants") operate under the under the umbrella of the Bosch Group, which encompasses some 340 subsidiaries and companies. The Bosch Group is divided into four business sectors: Mobility Solutions (formerly Automotive Technology), Industrial Technology, Consumer Goods, and Energy and Building Technology. The Mobility Solutions sector, which supplied parts to the automotive industry, and its Diesel Systems division, which develops, manufactures, and supplies diesel systems, are particularly at issue here and include the relevant individuals from both Bosch Defendants. Regardless of whether an individual works for Bosch in Germany or the United States, the individual holds her or himself out as working for Bosch. This collective identity is captured by Bosch's mission statement: "We are Bosch," a unifying principle that links each entity and person within the Bosch Group.[1]

24.     The Bosch Defendants were knowing and active participants in the creation, development, marketing, and sale of illegal defeat devices for diesel vehicles specifically designed to evade U.S. emissions requirements in vehicles sold in the United States. These diesel vehicles include the Dodge Ram 1500 EcoDiesel and Jeep Grand Cherokee EcoDiesel, as well as diesel vehicles made by Volkswagen, Mercedes, and other manufacturers. Bosch's involvement in skirting diesel emissions standards encompasses work with multiple companies and predates the identified Class Vehicles in this Complaint.

---

[1] Bosh Mission Statement, available at http://www.wearebosch.com/index.en.html (last accessed January 12, 2017)

25.     Bosch participated not only in the development of the defeat device(s), but in the scheme to prevent U.S. regulators from uncovering the device's true functionality. Moreover, Bosch's participation was not limited to engineering the defeat device(s). Bosch was a knowing and active participant in massive conspiracies with Fiat Chrysler, Volkswagen, and other diesel manufacturers to defraud U.S. consumers, regulators, and the public at large.

26.     During the Class Period, each Defendant acted as an agent, servant, employee, or joint venturer of the other Defendants and in doing the things alleged acted within the course of such agency, employment, or in furtherance of the joint venture to accomplish the scheme. Each Defendant's acts alleged herein was done with the permission and consent of each of the other Defendants. While each of the Defendants are separate legal entities, each Defendant works together under a common identity as portrayed to the public and there is sufficient unity of interest and control between each Defendant such that the acts of one are for the benefit and can be imputed to the acts of the other.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d). The matter in controversy exceeds $5,000,000 exclusive of interest and costs, and this matter is a class action in which certain class members are citizens of States other than each Defendant's state of citizenship. The Court also has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs and the Class have brought a claim pursuant to 15 U.S.C. § 2301 *et seq.* and claims under the RICO Act, 18 U.S.C. § 1962. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

28.     This Court has personal jurisdiction over Plaintiffs because Plaintiff Kirt Rothe resides in Brunswick, Georgia and Plaintiff Catherine Plaster resides in Bloomingdale, Georgia.

This Court has personal jurisdiction over each Defendant pursuant to 18 U.S.C. § 1965(b) & (d), and/or Ga. Code Ann. § 9-10-91. This Court has personal jurisdiction over Defendants because they have minimum contacts with the United States, this judicial district, and this State, and intentionally availed themselves of the laws of the United States and this state by distributing, testing, selling, leasing, and/or providing warranties for Fiat Chrysler vehicles in this State and District. At least in part because of Fiat Chrysler's and Bosch's misconduct as alleged in this Complaint, Class Vehicles ended up on this State's roads and in dozens of dealerships across the State.

29.     Venue is proper in this Court under 28 U.S.C. § 1391 because Fiat Chrysler advertises, markets, leases, and sells a substantial number of automobiles in this District and has dealerships in this District. Furthermore, a substantial part of the events alleged in this Complaint giving rise to Plaintiff and the Class's claims, including the false and misleading advertising alleged herein, occurred in, emanated from and/or were directed from this District. Venue is also proper in this Court because Fiat Chrysler and Bosch caused harm to Class Members residing in this District.

## SPECIFIC FACTUAL ALLEGATIONS

### Emissions regulation in the United States

30.     1970 was a turning point for air pollution control in the United States. First, Congress enacted the Clean Air Act. That Act required a 90% reduction in emissions from new automobiles by 1975. The EPA, also established by Congress, is responsible for regulating motor vehicle pollution as one of its mandates.

31.     The Clean Air Act was enacted "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its

population," and "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution." 42 U.S.C. § 7401(b)(1)-(2).

32.     One of the requirements of the Clean Air Act is that vehicle manufacturers certify to the EPA that their products meet the requisite federal emission standards to control air pollution. To ensure that every vehicle introduced into United States commerce satisfies applicable emission standards the EPA administers a certification program. The EPA issues certificates of conformity ("COC"), under this standard and approves the introduction of vehicles satisfying the standards into United States commerce. Certificates of conformity must be issued by the EPA for every vehicle sold in the United States.[2] Class Vehicles (light-duty motor vehicles) at issue in this Complaint, must also obtain the COC. Additionally, emission standards for certain air pollutants, which include nitrogen oxides (NOx), must be satisfied by the Class Vehicles. 40 C.F.R. § 86.1811-04; 42 U.S.C. § 7401(b)(1)-(2).

33.     Diesel vehicles face a particular challenge in meeting emission standards. Diesel engines work by compressing a charge of air until it reaches high enough pressure and temperature to spontaneously combust diesel fuel, which is injected into the hot charge, rather than relying on a spark plug to initiate combustion as in a typical gasoline engine.

34.     Diesel engines operate with higher compression and expansion ratios than gasoline engines, and without a throttle, and therefore are more fuel efficient. However, because of the inhomogeneous nature of diesel combustion, and higher flame temperatures, a diesel engine typically produces more pollutants, which are more difficult to treat. The World Health Organization deemed them carcinogenic and approximately as dangerous as asbestos in 2012.

---

[2] *Id.*

**Fiat Chrysler aggressively courts environmentally conscious diesel customers**

35.     Consumers have been growing increasingly more environmentally conscious, and automotive manufacturers have taken notice, developing hybrid, electric, hydrogen fuel cell, and "clean" diesel alternatives to standard gas engines. Over the years, Fiat Chrysler increased its emphasis on diesel cars and engaged in an extensive marketing campaign to sell more "clean" diesel vehicles in the United States.

36.     In 2014, Fiat Chrysler introduced its 3.0 liter "EcoDiesel" engine, aiming to capitalize on the green vehicle wave. The EcoDiesel engine found its home in the 2014 Dodge Ram 1500 EcoDiesel and the 2014 Jeep Grand Cherokee EcoDiesel.

37.     Fiat Chrysler aggressively markets its EcoDiesel vehicles as having "advanced clean diesel technology," "unbelievable fuel economy," "ultra clean," and "emissions compliant." YouTube videos are part of Fiat Chrysler's advertising campaign for the Jeep EcoDiesel vehicles, including a nearly five minute commercial featuring photographers popular on social media that has been viewed well over a quarter of a million times on YouTube alone. Another video touted the 2014 Jeep Grand Cherokee EcoDiesel as "the greenest Jeep we've ever done."

38.     Fiat Chrysler continued its barrage of advertisements promoting its vehicles as fuel-efficient, green and safe vehicles at an attractive price. Fiat Chrysler also represented that the EcoDiesel vehicles have "amazing capability," "amazing fuel economy," an "amazing powertrain" and an "amazing range." Yet Fiat Chrysler also emphasized the environmentally

friendly nature of the EcoDiesel vehicles and held itself out as a champion of the environment. These representations were false.

39.     Fiat Chrysler's widespread television, internet, and social media marketing paid off. Fiat's EcoDiesel vehicles were being promoted and sales increased. Fiat Chrysler was awarded as one of the 2014 Ward's 10 Best Engines for its EcoDiesel engine at an event sponsored in part by Bosch.

40.     In contradiction to its advertisements, the Class Vehicles were not environmentally friendly. Instead, Fiat Chrysler and Bosch had knowingly and intentionally manipulated the Class Vehicle's emission system, and the Class Vehicles were actually emitting well above the legal limit.

**International emissions cheating: real world dirty, road test "clean" diesel**

41.     After news of the now globally-known emissions cheating by Volkswagen broke, CARB and EPA looked at other diesel manufacturers with new vigor. On September 25, 2015, a week after issuing its notice of violation to Volkswagen, CARB sent a letter to multiple automobile manufacturers, including Fiat Chrysler, informing them that new testing methods would be used to screen a host of potentially affected models across a range of years for non-approved (undisclosed) Auxiliary Emission Control Devices (AECDs).[3]

42.     All modern engines are integrated with sophisticated computer components to manage the vehicle's operation, which includes engine control units (ECUs). Bosch tested, manufactured and sold the ECU and associated software (together, the "Bosch ECU") used by Volkswagen, Mercedes, and other manufacturers, as well as by Fiat Chrysler in the Class

---

[3] CARB Letter dated September 25, 2015, available at
https:// www.arb.ca.gov/newsrel/arb_iuc_2015)09_25_final_signed_letter.pdf.

Vehicles. Bosch has publicly touted the effectiveness of its products for low-emission diesel vehicles.

43.     Bosch worked with Fiat Chrysler to create a unique set of specifications and software code to manage the vehicles' engine operation.

44.     With respect to the Class Vehicles, the Bosch ECU was also enabled by Bosch and Fiat Chrysler to surreptitiously evade emissions regulations. Both the Dodge Ram 1500 and the Jeep Grand Cherokee (the Class Vehicles) run Bosch software. Bosch and Fiat Chrysler worked together to develop and implement a specific set of software algorithms for implementation in the Class Vehicles, which permitted Fiat Chrysler to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates (where applicable). When carmakers test their vehicles against EPA emission standards, they place their cars on dynamometers (large rollers) and then perform a series of specific maneuvers prescribed by federal regulations.

45.     Bosch's ECUs and software gave Volkswagen the ability to detect test conditions by monitoring vehicle speed, acceleration, engine operation, ambient air pressure, and even the position of the steering wheel. Fiat Chrysler used the Bosch ECU, which contained 8 undisclosed AECDs (defeat devices) to reduce the effectiveness of the emission control system when conditions were detected which were **not the test cycle**. Such non-test-cycle conditions occur frequently in everyday driving, and lead to the production of excess amounts of NOx.

46.     This workaround is illegal. The Clean Air Act expressly prohibits defeat devices, defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 86.1803-01; *see also id.* § 86.1809-10 ("No new light-

duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy duty vehicle shall be equipped with a defeat device."). Moreover, the Clean Air Act prohibits the sale of components used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3). Finally, in order to obtain a COC, automakers must submit an application, which lists all AECDs installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

47.     To obtain the COCs necessary to sell its vehicles, Fiat Chrysler did not disclose, and affirmatively concealed, the presence of the test-detecting and performance altering software code that it developed with Bosch from government regulators, making the software an illegal defeat device.

48.     Because the COCs were fraudulently obtained, and because the Class Vehicles did not conform "in all material respects" to the specifications provided in the COC applications, the Class Vehicles were never covered by a valid COC and therefore were never legal for sale, or EPA and/or CARB compliant, as represented. Fiat and Bosch hid these facts from EPA, other regulators, and its dealers and consumers. Fiat Chrysler continued to sell and lease the Class Vehicles to the driving public, despite their illegality, and with the complicity of Bosch.

49.     Fiat Chrysler's illegal workaround was enabled by its close relationship with Bosch, which derives a sizeable portion of its annual revenue from developing and manufacturing parts for use in diesel vehicles, including those made by Fiat Chrysler. Bosch was well aware that Fiat was using its emissions control components as a defeat device and, in fact, worked with Fiat Chrysler to develop the software algorithms specifically tailored for the Class Vehicles.

**Fiat Chrysler gets caught cheating by EPA and CARB**

50.     The EPA issued a notice of violation of the Clean Air Act, 42 U.S.C. §§ 7401 –

7671q, and its implementing regulations to Fiat Chrysler on January 12, 2017. According to the

notice, Fiat Chrysler's light-duty diesel vehicles from 2014-2016 contained at least eight

undisclosed AECDs that "appear to cause the vehicle to perform differently when the vehicle is

being tested for compliance with the EPA emission standards using the Federal emission test

procedure (e.g. FTP, US06), than in normal operation and use."[4] Among other violations, EPA

asserts "FCA violated section 203(a)(1) of the CAA [Clean Air Act], 42 U.S.C. S 7522(a)(1),

each time it sold, offered for sale, introduced into commerce, delivered for introduction into

commerce, or imported (or caused any of the foregoing with respect to) approximately 103,828

new motor vehicles within these test groups."[5] CARB also issued a notice of violation to Fiat

Chrysler on January 12, 2017.

51.     Fiat Chrysler did not act alone. At the heart of the diesel scandal are the Bosch

Defendants. Bosch was an active and knowing participant in the scheme to evade U.S. emissions

requirements. Bosch manufactured and tested the engine control unit and software that allowed

Fiat Chrysler to implement the defeat device(s).

52.     Defeat devices, like the one(s) used by Fiat Chrysler, cheat the emission control

systems in a vehicle that are used to comply with the Clean Air Act emission standards. The

defeat devices use multiple factors in sensing whether the vehicle is being tested for compliance

---

[4] EPA Notice of Violation or Model Year 2014-2016 diesel light-duty vehicles (Dodge Ram and Jeep Grand
Cherokee), available at https://www.epa.gov/sites/production/files/2017-01/documents/fca-caa-nov-2017-01-12.pdf.
[5] *Id.*

with EPA emission standards. The parameters of the federal test procedure used for emission testing for EPA certification purposes are tracked by these inputs.

53.    The Class Vehicles contain at least eight undisclosed AECDs, which work to alter the performance of the vehicles when testing conditions are present. When the Class Vehicles were not being tested, the EcoDiesel vehicles polluted at levels far above the legal limits set by EPA and CARB.

54.    Fiat Chrysler's use of the defeat device caused the Class Vehicles to not conform in all material respects to the vehicle specifications described in the applications for the COCs. As a result, Fiat Chrysler violated section 203(a)(1) of the Clean Air Act, 42 U.S.C. § 7522(a)(1), by selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing these vehicles, or for causing any of the foregoing acts.

55.    Fiat Chrysler violated the Clean Air Act by making and selling vehicles with defeat devices that cheated emissions testing and also allowed for higher levels of air emissions than they certified to EPA when not being tested.

56.    Fiat Chrysler knew that the defeat devices it designed and installed would cheat the Clean Air Act emission standards because the software was designed to track the parameters of the federal test procedure and alter the emission control system so that it underperformed whenever the software determined the vehicle was not undergoing emissions testing.

57.    The purpose of the Clean Air Act and associated regulations is to reduce emissions of NOx and other pollutants from mobile sources of air pollution in an effort to protect human health and the environment. NOx pollution damages the environment and is a risk to human health.

58.     It is well documented that these pollutants are associated with serious health effects, including increased asthma attacks and other respiratory illnesses. Exposure to ozone and particulate matter which result from nitrogen dioxide, a by-product of NOx emissions, have been linked to an increased risk of heart attacks, strokes, and premature death due to respiratory-related or cardiovascular-related effects. Recent studies have shown that not only can NOx cause or exacerbate a number of health conditions, but exposure to these toxins are correlated with lower birth weight and smaller head circumference in babies.[6]

59.     Eco-friendly vehicles are central to our environment and health. The largest selling factor for diesel cars is their fuel economy and low carbon emissions as compared to standard gasoline engines. Diesel fuel also contains more energy density than gasoline. These characteristics result in anywhere from 20% to 40% better fuel economy. As a result, the United States and Georgia governments have encouraged the use of diesel engines to meet fuel efficiency and greenhouse gas targets.

60.     The down side of diesel cars is that they emit far more nitrogen dioxide than standard gasoline engines. Consumers are charged substantially more upfront when purchasing the vehicles. Class Members, under the impression they were buying an eco-friendly car among other characteristics, paid a significant premium for their Class Vehicles.

61.     According to automotive technology experts, disengaging the pollution controls on a diesel-fueled car can yield better fuel economy, urea consumption and performance, including increased torque and acceleration. Fiat Chrysler benefitted from these features because they increased the Class Vehicles' selling appeal.

---

[6] "Review of evidence on health aspects of air pollution – REVIHAAP Project," World Health Organization, Regional Office for Europe, World Health Organization 2013.
http://www.euro.who.int/_data/assets/pdf_file/0004/193108/FEVIHAAP- Final-technical-report-final-version.pdf?ua=1.

62.     Fiat Chrysler cheated Class Members by covertly and intentionally disregarding United States regulations put in place to protect consumers and the environment.

63.     Fiat Chrysler charged a substantial premium on their "clean" diesel vehicles – which Fiat ironically marketed under the term "EcoDiesel."

64.     Plaintiffs and the Class have been harmed as a result of Fiat Chrysler's actions. Members of the Class would not have purchased the Class Vehicles, and/or would have paid substantially less for their vehicle. The loss of value to the Class Vehicles is directly attributable to Defendants' fraudulent and deceptive actions. The Class Vehicles are not worth as much in a trade or sale as if the vehicle had been as warranted. The value of the Class Vehicles is furthered decreased by this actual harm and also the harm to the brand.

65.     Plaintiffs and the Class will more than likely lose the use of their vehicles as a result of a recall. Moreover, in order for the vehicles to comply with federal emission standards the vehicles will have reduced fuel economy and reduced acceleration during real world use after the Class Vehicles are remediated. As a result, the Plaintiffs' Class has sustained incidental and consequential damages as herein alleged.

## CLASS ACTION ALLEGATIONS

66.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and all others similarly situated. Plaintiffs seek to represent the following Classes:

**Nationwide RICO Class**

All persons or entities in the United States who owned or leased a Class Vehicle.

**Georgia Class**

All current and former owners of Class Vehicles who reside in the State of Georgia and/or who purchased or leased Class Vehicles in Georgia.

67.    Expressly excluded from the Classes are Defendants and their subsidiaries, affiliates, officers, directors, and employees.

68.    Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of his claims on a classwide basis using the same evidence as would be used to prove those elements on an individual basis. The proposed Classes are appropriate under Rule 23(a), 23(b), 23(b)(2), or 23(b)(3). The proposed Classes are made up of thousands of persons dispersed throughout Georgia and joinder is impracticable. The precise number and identity of Class Members are unknown to Plaintiffs at this time, but can be obtained from Fiat Chrysler's internal records.

69.    There are questions of law and fact common to the members of the Classes, which predominate over questions affecting only individual Class members, including:

- Whether Bosch designed and manufactured a defeat device;

- Whether Bosch supplied the defeat device to Fiat Chrysler with the knowledge that Fiat Chrysler would use it in production of Class Vehicles;

- Whether Fiat Chrysler and Bosch engaged in the conduct alleged in this Complaint;

- Whether Fiat Chrysler knew about the defeat device and, if so, how long Fiat Chrysler has known;

- Whether Fiat Chrysler's publicity and advertising regarding the environmental friendliness, fuel emission compliance, fuel efficiency and/or performance of the Class Vehicles was misleading;

- Whether Fiat Chrysler has engaged in unlawful, unfair or fraudulent business practices;

- Whether Fiat Chrysler misrepresented the emission standards compliance and credentials, fuel efficiency and/or performance of the Class Vehicles;

- Whether Fiat Chrysler misrepresented the emissions levels, fuel efficiency and/or performance that the Class Vehicles could achieve under normal driving conditions;

- Whether Fiat Chrysler publicized and advertised the environmental friendliness, fuel emission compliance, fuel efficiency and/or performance of the Class Vehicles;

- Whether Fiat Chrysler's misrepresentations and omissions regarding the compliance with emissions levels, environmental friendliness, fuel efficiency and/or performance of the Class Vehicles has deceived or is likely to have deceived Plaintiffs and the Class;

- Whether Bosch acted in concert with Fiat Chrysler and aided and abetted Fiat Chrysler's fraud;

- Whether Fiat Chrysler's and Bosch's conduct violates RICO and other laws;

- Whether Fiat Chrysler's conduct violated the Magnuson- Moss Warranty Act;

- Whether Fiat Chrysler breached express and/or implied warranties;

- Whether Fiat Chrysler's unlawful, unfair or deceptive practices have harmed Plaintiffs and the Class members;

- Whether Plaintiffs and the members of each Class are entitled to equitable or injunctive relief and,

- Whether Plaintiffs and the members of each Class are entitled to damages, including punitive damages.

70.     Plaintiffs are a member of the Classes and Plaintiffs' claims are typical of the claims of the Classes.

71.     Plaintiffs are willing and prepared to serve the Court and the proposed Classes in a representative capacity. Plaintiffs will fairly and adequately protect the interests of the Classes and has no interests adverse to or which conflict with the interests of the other members of the Classes.

72.     Plaintiffs have engaged the services of counsel who are experienced in complex class litigation, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent the Plaintiffs and absent Class members.

73.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistency and varying adjudications, establishing incompatible standards of conduct for Fiat Chrysler and Bosch.

74.     Fiat Chrysler and Bosch have acted on grounds generally applicable to the Classes, thereby making relief with respect to the members of the Classes as a whole appropriate.

75.     A class action is superior to other available means for the fair and efficient adjudication of this controversy. Prosecution of the complaint as a class action will provide redress for individual claims too small to support the expense of complex litigation and reduce the possibility of repetitious litigation.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF RACKETEER INFLUENCED**
**AND CORRUPT ORGANIZATIONS ACT (RICO)**
**18 U.S.C. § 1962(c) – (d)**

76.     Plaintiffs re-allege and incorporate by reference the allegations set forth above.

77.    Plaintiffs brings this claim individually and on behalf of the Nationwide RICO Class against all Defendants.

78.    Defendants are all "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

79.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate."

80.    For many years now, Defendants have aggressively sought to increase the sales of Class Vehicles in an effort to bolster revenue, augment profits and increase Fiat Chrysler's share of the diesel vehicle market. Finding it impossible to achieve their goals lawfully, however, Bosch and Fiat resorted instead to orchestrating a fraudulent scheme and conspiracy. In particular, Bosch and Fiat, along with other entities and individuals, created and/or participated in the affairs of an illegal enterprise (the "Enterprise") that's primary purpose was to deceive the regulators and the public into believing the Class Vehicles were "clean" and environmentally friendly." As explained in greater detail below, Bosch's and Fiat's acts in furtherance of the Enterprise violate section 1962(c) and (d).

81.    Upon information and belief, the Enterprise consisted of FCA US LLC, Fiat Chrysler Automobiles N.V., Robert Bosch GmbH, and Robert Bosch LLC.

82.    Bosch tested, manufactured, advertised and sold the electronic control unit and associated software that managed the emissions control system used by Fiat Chrysler in the Class Vehicles (referred to collectively as the "Bosch ECU").

83.     Bosch's bad acts are not limited to the conspiracy with Fiat Chrysler that is the subject of this Complaint. Bosch also worked with Volkswagen, Mercedes, and other manufacturers to develop and implement a specific and unique sets of software algorithms for those manufacturers to surreptitiously evade emissions regulations.

84.     In this case, Bosch customized the ECU for installation in the Class Vehicles with unique software code to detect when the vehicle was undergoing emissions testing, as described above.

85.     Bosch's involvement in emissions cheating came to light during the litigation concerning Volkswagen's defeat device. As was publicly reported, the Bosch Defendants, seeking to conceal their involvement in the unlawful Enterprise, sent a letter to Volkswagen AG in 2007 stating that Volkswagen diesels could not be lawfully operated if the LNT or SCR after treatment was disabled.[7] The exact same logic applies to the Fiat Chrysler Class Vehicles., as several of the AECDs identified by EPA alter SCR (selective catalytic reduction). For example:

> The operation of AECD #4 [DEF Dosing Disablement during SCR Adaptation], particularly when combined with AECD #8 [Use of Load Governor to Delay Ammonia Refill of SCR Catalyst], increases emissions of tailpipe NOx under conditions reasonably expected to be encountered in normal vehicle operation and use.
> EPA NOV letter dated January 12, 2017, pp. 5-6.

86.     The persons and entities described in paragraph 81 are members of and constitute an "association-in-fact" enterprise.

87.     At all relevant times, the Enterprise: (a) had an existence separate and distinct from each Defendant; (b) was separate and distinct from the pattern of racketeering in which Defendants engaged; and (c) was an ongoing organization consisting of legal entities, including Fiat Chrysler and Bosch, and other entities and individuals associated for the common purpose of

---

[7] Stef Shrader, *Feds Are Now Investigating Volkswagen Supplier Bosch Over Dieselgate*, Jalopnik (Nov. 19, 2015), http://jalopnik.com/feds-are-now-investgating-volkswagen-supplierbosch-ov-1743624448.

designing, manufacturing, distributing, testing, and selling the Class Vehicles through fraudulent COCs and EOs, false emissions tests, deceptive and misleading marketing and materials, and deriving profits and revenues from those activities. Each member of the Enterprise shared in the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud consumers and franchise dealers alike nationwide.

88.    The Enterprise functioned by selling vehicles and component parts to the consuming public. Many of these products are legitimate, including vehicles that do not contain defeat devices. However, Bosch, Fiat Chrysler, and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell the Class Vehicles.

89.    The Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Class Vehicles throughout the country, and the receipt of monies from the same.

90.    Within the Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Class Vehicles to the general public nationwide.

91.     Each participant in the Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Enterprise, Bosch and Fiat functioned as a continuing unit with the purpose of

furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

92.    Defendants participated in the operation and management of the Enterprise by directing its affairs, as described herein. While Bosch and Fiat Chrysler participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

93.    Fiat Chrysler exerted substantial control and participated in the affairs of the Enterprise by:

(a)    Designing the Class Vehicles with defeat devices;

(b)    Failing to correct or disable the defeat devices when warned;

(c)    Manufacturing, distributing, and selling the Class Vehicles that emitted greater pollution than allowable under the applicable regulations;

(d)    Misrepresenting and omitting, or causing such misrepresentations and omissions to be made, vehicle specifications on COC and EO applications;

(e)    Introducing the Class vehicles into the stream of U.S. commerce without a valid EPA COC and/or CARB EO;

(f)    Concealing the existence of the defeat devices and the unlawfully high emissions from regulators and the public;

(g)    Persisting in the manufacture, distribution, and sale of the Class Vehicles even after questions were raised about the emissions testing and discrepancies concerning the same;

(h)    Misleading government regulators as to the nature of the defeat devices and the defects in the Class Vehicles;

(i)    Designing and distributing marketing materials that misrepresented and concealed the defect in the Class Vehicles;

(j)    Otherwise misrepresenting or concealing the defective nature of the Class Vehicles from the public and regulators; and

(k)    Illegally selling and/or distributing the Class Vehicles; collecting revenues and profits from the sale of such products, and ensuring that the other Defendants and unnamed coconspirators complied with the fraudulent scheme.

94.    Bosch also participated in, operated, and/or directed the Enterprise. Bosch participated in the fraudulent scheme by manufacturing, installing, testing, modifying, and supplying the Bosch ECU, which effectively evaded emissions requirements and regulations. Bosch exercised tight control over the coding and other aspects of the software and closely collaborated with Fiat Chrysler to develop, customize, and calibrate the Bosch ECU and/or 8 undisclosed AECDs. Additionally, Bosch continuously cooperated with Fiat Chrysler to ensure that the Bosch ECU was fully integrated into the Class Vehicles. Bosch also participated in the affairs of the Enterprise by concealing the defeat devices on United States documentation and in communications with United States regulators. Bosch collected millions of dollars in revenues and profits from the Bosch ECUs installed in the Class Vehicles.

95.    Without Defendants' willing participation, including Bosch's active involvement in developing and supplying the critical defeat devices for the Class Vehicles, the Enterprise's scheme and common course of conduct would not have been successful.

96. Bosch and Fiat Chrysler directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because Bosch, Fiat, and other unidentified co-conspirators control such information.

97. The members of the Enterprise all served a common purpose; namely, to outsell their law-abiding competitors and increase their revenues through the sale of as many Class Vehicles (including the emissions components made and sold by Bosch) as possible. Each member of the Enterprise shared the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud. Fiat Chrysler sold more Class Vehicles by using an emissions control system that was cheaper to install and allowed for generous performance and efficiency tuning, all the while charging consumers a premium for purportedly "clean," "environmentally friendly" and "fuel efficient" Class Vehicles. The Bosch Defendants, in turn, sold more ECUs because Fiat Chrysler manufactured and sold more Class Vehicles. Bosch and Fiat achieved their common purpose by repeatedly misrepresenting and concealing the nature of the Class Vehicles and the ability of the emissions control systems (including the Bosch-supplied parts) to effectively reduce toxic emissions during normal operating conditions.

98. To carry out, or attempt to carry out the scheme to defraud, Bosch and Fiat conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

99.   Specifically, Bosch and Fiat Chrysler participated in the scheme to defraud by using mail, telephone, and the Internet to transmit writings travelling in interstate or foreign commerce.

100.   Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by Bosch, Fiat Chrysler, or third parties that were foreseeably caused to be sent as a result of Bosch's and Fiat's illegal scheme:

(a)   Orders of and invoices for Class Vehicles;

(b)   Communications within the Enterprise;

(c)   Shipments of Class Vehicles;

(d)   Invoices for component parts;

(e)   False or misleading communications, including advertisements, representing the Class Vehicles as emissions compliant or environmentally friendly;

(f)   Documents intended to facilitate the sale of Class Vehicles;

(g)   Revenues and profits to members of the Enterprise;

(h)   Meeting invitations, agendas, and minutes;

(i)   Other paperwork and communications concerning the Class Vehicles and/or Bosch ECU;

(j)   Bills of lading, invoices, shipping records, reports, and correspondence;

(k)   Deposits of proceeds; and

(l)   Other documents and things, including electronic communications.

101.   The mail and wire transmissions described herein were made in furtherance of Bosch's and Fiat's scheme and common course of conduct to deceive regulators and consumers

and lure consumers into purchasing the Class Vehicles, which Bosch and Fiat knew or recklessly disregarded as emitting illegal amounts of pollution, despite their advertising campaign that the Class Vehicles were "clean" diesel cars.

102.    Many of the precise dates of the fraudulent uses of the United State's Mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Bosch's and Fiat's books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

103.    Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Bosch and Fiat Chrysler conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as Defendants in this Complaint, have participated as co-conspirators with Bosch and Fiat in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for Bosch, Fiat Chrysler, and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

104.    Bosch and Fiat Chrysler aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

105.    To achieve their common goals, Bosch and Fiat hid from the general public the unlawfulness and emission dangers of the Class Vehicles and obfuscated the true nature of the defect even after regulators raised concerns. Bosch and Fiat suppressed and/or ignored warnings

from third parties, whistleblowers, and governmental entities about the discrepancies in emissions testing and the defeat devices present in the Class Vehicles.

106.    Bosch, Fiat Chrysler, and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Class Vehicles (and the defeat devices contained therein).

107.    Indeed, for the conspiracy to succeed, Bosch, Fiat Chrysler, and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics—specifically complete secrecy about the defeat devices in the Class Vehicles.

108.    Bosch and Fiat Chrysler knew and intended that government regulators, as well as Plaintiffs and Class members, would rely on the material misrepresentations and omissions made by them about the Class Vehicles. Bosch and Fiat knew and intended Plaintiffs and the Class would incur costs and damages as a result. As fully alleged herein, Plaintiffs and the Class relied upon Bosch's and Fiat's representations and omissions that were made or caused by them. Plaintiffs' reliance is made obvious by the fact that: (1) they purchased hundreds of thousands of vehicles that never should have been introduced into the U.S. stream of commerce and whose worth is far less. In addition, the EPA, CARB, and other regulators relied on the misrepresentations and material omissions made or caused to be made by Defendants; otherwise Fiat Chrysler could not have obtained valid COCs and EOs to sell the Class Vehicles.

109.    Bosch's and Fiat's conduct in furtherance of this scheme was intentional. Plaintiffs and the Class were harmed as a result of Defendants' intentional conduct. Plaintiffs, the

Class, regulators and consumers, among others, relied on Bosch's and Fiat's material misrepresentations and omissions.

110.    During the design, manufacture, testing, marketing and sale of the Class Vehicles, Bosch and Fiat Chrysler shared technical, marketing and financial information that plainly revealed the emissions control systems in the Class Vehicles as the ineffective, illegal and fraudulent piece of technology they were and are. Nevertheless, Bosch and Fiat Chrysler shared and disseminated information that deliberately represented Class Vehicles as "clean," "environmentally friendly," and "fuel efficient."

111.    By reason of and as a result of the conduct of Bosch and Fiat Chrysler, and, in particular, their pattern of racketeering activity, Plaintiffs and the Class have been injured in multiple ways, including, but not limited to:

> (a)    Overpayment for Class Vehicles, as Plaintiffs and Class believed that they were paying for vehicles that met certain emission and fuel efficiency standards and obtained vehicles that were not legal to sell in the United States; and
>
> (b)    The value of the Class Vehicles have diminished, thus reducing their sale and resale value.

112.    Bosch's and Fiat's violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs and the Class are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c). Bosch and Fiat knew, understood, and intended for members of the Class to purchase the Class

Vehicles, and knew, understood, and foresaw that revelation of the truth would injure members of the Class.

## SECOND CAUSE OF ACTION
### IMPLIED AND WRITTEN WARRANTY
#### Magnuson-Moss Warranty Act (15 U.S.C. § 2301 et seq.)

113.    Plaintiffs re-allege and incorporate by reference the allegations set forth above.

114.    This claim is brought by Plaintiffs and the Georgia Class under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq.

115.    The Class Vehicles are consumer products as defined in 15 U.S.C. § 2301(1).

116.    Fiat Chrysler is a supplier and warrantor as defined in 15 U.S.C. § 2301(4)-(5).

117.    Written warranties as defined in 15 U.S.C. §2301(6)(A) and/or (B), which Fiat Chrysler has breached were received by Plaintiffs and the Class.

118.    Plaintiffs and the Class are "consumers" as defined in 15 U.S.C. § 2301(3). Because they bought a Class Vehicle, they are consumers, and they are entitled to enforce both written and implied warranties under Georgia law.

119.    Under 15 U.S.C. § 2310(e), Plaintiffs and the Class are not required to provide Fiat Chrysler notice of this class action and an opportunity to cure until the time the Court determines the representative capacity of Plaintiffs pursuant to F.R.Civ.P. 23.

120.    Fiat Chrysler breached their written warranties, and are therefore liable to Plaintiffs and the Class under 15 U.S.C. § 2310(d)(1).

121.    As part of the sale transactions relating to the Class Vehicles, Fiat Chrysler gave an implied warranty under the Act. As part of that implied warranty, Fiat warranted that the

Class Vehicle complied with all applicable federal and state regulations, including emission regulations. The implied warranty of merchantability was breached by Fiat.

122. As a result of Fiat Chrysler's breaches of the warranties to Plaintiffs, Plaintiffs and the Class are entitled to damages. These damages include economic damages including either a return of Plaintiffs' and Class Members' purchase price; and/or the difference between the price paid for the Class Vehicle as warranted and the actual value of the Class Vehicle as delivered, and consequential damages.

123. Further, Plaintiffs and the Class are entitled to reasonable attorneys' fees and costs as determined by the Court.

## THIRD CAUSE OF ACTION
## FRADULENT CONCEALMENT

124.    Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

125.     This claim is brought on behalf of the Georgia Subclass against FCA.

126.    Defendant intentionally concealed that the NOx reduction system in the Affected Vehicles turns off or is limited during normal driving conditions, that the Affected Vehicles had defective emissions controls, emitted pollutants at a higher level than gasoline-powered vehicles, emitted pollutants higher than a reasonable consumer would expect in light of Defendant's advertising campaign, emitted unlawfully high levels of pollutants such as NOx, and were non-compliant with EPA emission requirements, or Defendant acted with reckless disregard for the truth and denied Plaintiffs and other Subclass members information that is highly relevant to their purchasing decision.

127.    Defendant further affirmatively misrepresented to Plaintiffs and Subclass members in advertising and other forms of communication, including standard and uniform

material provided with each car, that the Affected Vehicles it was selling had no significant defects, were Earth-friendly and low-emission vehicles, complied with EPA regulations, and would perform and operate properly when driven in normal usage.

128.    Defendant knew these representations were false when made.

129.    The Affected Vehicles purchased or leased by Plaintiffs and the other Subclass members were, in fact, defective, emitting pollutants at a much higher rate than gasoline-powered vehicles and at a much higher rate than a reasonable consumer would expect in light of Defendant's advertising campaign, non-EPA-compliant, and unreliable because the NOx reduction system in the Affected Vehicles turns off or is limited during normal driving conditions.

130.    Defendant had a duty to disclose that the NOx reduction system in the Affected Vehicles turns off or is limited during normal driving conditions and that the Affected Vehicles were defective, employed a "defeat device," emitted pollutants at a much higher rate than gasoline-powered vehicles, had emissions that far exceeded those expected by a reasonable consumer, and were non-EPA compliant and unreliable, because Plaintiffs and the other Subclass members relied on Defendant's material representations that the Affected Vehicles they were purchasing were reduced emission vehicles, efficient, and free from defects.

131.    As alleged in this Complaint, at all relevant times, Defendant has held out the Affected Vehicles to be reduced-emissions, EPA-compliant vehicles. Defendant disclosed certain details about the diesel engines, but nonetheless, Defendant intentionally failed to disclose the important facts that the NOx reduction system in the Affected Vehicles turns off or is limited during normal driving conditions, and that the Affected Vehicles had defective emissions controls, deploy a "defeat device," emitted higher levels of pollutants, and were non-

compliant with EPA emissions requirements, making other disclosures about the emission system deceptive.

132.    The truth about the defective emissions controls and Defendant's manipulations of those controls, unlawfully high emissions, the "defeat device," and non-compliance with EPA emissions requirements was known only to Defendant; Plaintiffs and the Subclass members did not know of these facts, and Defendant actively concealed these facts from Plaintiffs and Subclass members.

133.    Plaintiffs and Subclass members reasonably relied upon Defendant's deception. They had no way of knowing that Defendant's representations were false and/or misleading. As consumers, Plaintiffs and Subclass members did not, and could not, unravel Defendant's deception on their own. Rather, Defendant intended to deceive Plaintiffs and Subclass members by concealing the true facts about the Affected Vehicles' emissions.

134.    Defendant also concealed and suppressed material facts concerning what is evidently the true culture of Defendant—a culture characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. Defendant also emphasized profits and sales above the trust that Plaintiffs and Subclass members placed in its representations. Consumers buy diesel cars from Defendant because they feel they are clean diesel cars. They do not want to be spewing noxious gases into the environment. And yet, that is precisely what the Affected Vehicles are doing.

135.    Defendant's false representations were material to consumers because they concerned the quality of the Affected Vehicles, because they concerned compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also

because the representations played a significant role in the value of the vehicles. As Defendant well knew, its customers, including Plaintiffs and Subclass members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, clean diesel cars with reduced emissions, and they paid accordingly.

136.     Defendant had a duty to disclose the emissions defect, defective design of emissions controls, and violations with respect to the affected Vehicles because details of the true facts were known and/or accessible only to Defendant, because Defendant had exclusive knowledge as to such facts, and because Defendant knew these facts were not known to or reasonably discoverable by Plaintiffs or Subclass members. Defendant also had a duty to disclose because it made general affirmative representations about the qualities of the vehicles with respect to emissions, starting with references to them as reduced-emissions diesel cars and as compliant with all laws in each state, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual emissions of the vehicles, Defendant's actual philosophy with respect to compliance with federal and state clean air laws and emissions regulations, and Defendant's actual practices with respect to the vehicles at issue. Having volunteered to provide information to Plaintiffs and Subclass members, Defendant had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the affected Vehicles purchased or leased by Plaintiffs and Subclass members. Whether a manufacturer's products pollute, comply with federal and state clean air laws and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, are material concerns to a consumer, including with respect to the emissions certifications testing their vehicles must pass. Defendant represented to Plaintiffs and Subclass members that they were

purchasing or leasing reduced-emission diesel vehicles when, in fact, they were purchasing or leasing defective, high-emission vehicles with unlawfully high emissions.

137.   Defendant actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not clean diesel vehicles and did not or could not comply with federal and state laws governing clean air and emissions, which perception would hurt the brand's image and cost Defendant money, and it did so at the expense of Plaintiffs and Subclass members.

138.   Defendant still has not made full and adequate disclosures, and continues to defraud Plaintiffs and Subclass members by concealing material information regarding the emissions qualities of the affected Vehicles.

139.   Plaintiffs and Subclass members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly reduced-emissions diesel cars manufactured by Defendant, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Subclass members' actions were justified. Defendant was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Subclass members.

140.   Because of the concealment and/or suppression of the facts, Plaintiffs and Subclass members have sustained damage because they own vehicles that are diminished in value as a result of Defendant's concealment of the true quality and quantity of those vehicles' emissions and Defendant's failure to timely disclose the defect or defective design of the diesel engine system, the actual emissions qualities and quantities of Defendant's vehicles, and the

serious issues engendered by Defendant's corporate policies. Had Plaintiffs and Subclass members been aware of the true emissions facts with regard to the Affected Vehicles, and Defendant's disregard for the truth and compliance with applicable federal and state laws and regulations, Plaintiffs and Subclass members who purchased or leased new or certified pre-owned vehicles would have paid less for their vehicles or would not have purchased or leased them at all.

141.    The value of Plaintiffs' and Subclass members' vehicles has diminished as a result of Defendant's fraudulent concealment of the defective emissions controls of the affected Vehicles, the unlawfully high emissions of the affected Vehicles, and the non-compliance with EPA emissions requirements, all of which has greatly tarnished Defendant's brand name, which is attached to Plaintiffs' and Subclass members' vehicles, and made any reasonable consumer reluctant to purchase any of the Affected Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

142.    Accordingly, Defendant is liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

143.    Defendant's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Subclass members' rights and the representations that Defendant made to them, in order to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## FOURTH CAUSE OF ACTION
### BREACH OF CONTRACT

144.    Plaintiffs re-allege and incorporates by reference each of the paragraphs set forth above as though fully set forth hereinafter.

145.    Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

146.    Defendants' misrepresentations and omissions alleged herein, including Defendants' failure to disclose the existence of the defeat device and the fact that the Class Vehicles emitted noxious gasses in excess of legal limits during normal operation, caused, Plaintiffs and the Class members to purchase or lease their Class Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the Class members would not have purchased or leased these Class Vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the defeat device. Accordingly, Plaintiffs and the Class members overpaid for their Class Vehicles and did not receive the benefits of their bargains.

147.    Each and every sale or lease of a Class Vehicle constitutes a contract between Defendants and the purchaser or lessee. Defendants breached these contracts by selling or leasing Plaintiffs and the Class members' Class Vehicles and by misrepresenting failing to disclose the existence of the defeat device and the fact that the Class Vehicles emitted noxious gasses in excess of legal limits during normal operation.

148.    As a direct and proximate result of Defendants' breach of contract, Plaintiffs and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

**FIFTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**

**(O.C.G.A. § 11.2-314 and 11-2A-212)**

149.    Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

150.    Plaintiffs bring this Count individually and on behalf of the other members of the Georgia Class (the "Class," for purposes of this Count).

151.    FCA US LLC is and was at all relevant times a merchant with respect to motor vehicles Under O.C.G.A. §. 1.1-2-104 and 11-2A-103.

152.    Pursuant to O.C.G.A. § 11-2-314 and 1 1-2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were sold and leased subject to an implied warranty of merchantability.

153.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles included illegal defeat devices and did not comply with applicable emissions standards.

154.    FCA had a reasonable opportunity to honor its warranty Obligations upon first notice of investigation by the EPA, and could have taken corrective steps at that time to repair or replace the defective Class Vehicles.

155.    Plaintiffs and the Class members suffered injuries due to the defective nature of the Class Vehicles and FCA's breach of the implied warranty of merchantability.

156.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an in amount to be proven at trial.

## SIXTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY
### (O.C.G.A. § 11-2-313 and 11-2A-21)

157.    Plaintiffs incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

158.    FCA US LLC is and was at all relevant times a merchant with respect to the Class Vehicles.

159.    FCA US LLC provided an express warranty through a Federal Emissions Performance Warranty required by the EPA. The Performance Warranty applies to required repairs during the first two years or 24,000 miles if a vehicle fails an emissions test with certain components being covered for up to eight years or 80,000 miles. FCA US LLC also provided a Design and Defect Warranties required by the EPA covers repairs to the emission system and related parts for two years or 24,000 miles with certain major components being covered for up to eight years or 80,000 miles.

160.    These warranties were part of the basis of the bargain that was reached when Plaintiffs and the Class members purchased or leased their Class Vehicles. FCA US LLC breached these express warranties by selling, and not repairing, the Class Vehicles that Were installed with defeat devices and that did not comply with the relevant emissions standards.

161.    FCA US LLC had a reasonable opportunity to honor its warranty obligations upon first notice of investigation by the EPA, and could have taken corrective steps at that time to repair or replace the defective Class Vehicles.

162.    Furthermore, the Federal Emission Warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the Class members whole and because FCA US LLC has railed and/or has refused to adequately provided the promised remedies within a reasonable time.

163.    Accordingly, recovery by Plaintiffs and the Class members is not limited to the limited warranty of repair, and Plaintiffs, individually and on behalf of the Class members, seeks all remedies as allowed by law.

164.    Also, as alleged in more detail herein, at the time that FCA US LLC warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and FCA US LLC improperly concealed material facts regarding its Class Vehicles. Plaintiffs and the Class members were therefore induced to purchase or lease the FCA US LLC Vehicles under false pretenses.

165.    Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to FCA US LLC's improper conduct as alleged herein, and due to its failure and/or continued failure to provide Such limited remedy Within a reasonable time, and any limitation on Plaintiffs' and the Class members' remedies would be insufficient to make them whole.

166.    As a direct and proximate result of FCA US LLC's breach of its express Warranty, Plaintiffs and the Class members have been damaged in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### UNJUST ENRICHMENT

167.    Plaintiffs re-allege and incorporates by reference the allegations set forth above.

168.     Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

169.     FCA US LLC has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to FCA US LLC's concealment of the installed defeat devices and the fact that the Class Vehicles emitted noxious gasses in excess of legal limits during normal operation, and Plaintiffs and the Class members have overpaid for these vehicles.

170.     FCA US LLC has received and retained unjust benefits from Plaintiffs and the Class members, and inequity has resulted.

171.      It is inequitable and unconscionable for FCA US LLC to retain these benefits.

172.     Because FCA US LLC concealed its fraud and deception, Plaintiffs and the Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from FCA US LLC's misconduct.

173.     FCA US LLC knowingly accepted the unjust benefits of its wrongful conduct. As a result of FCA US LLC's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and the Class members in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief as follows:

1.     An Order appointing Plaintiffs to represent the proposed Georgia Class and Nationwide RICO Class pursuant to Fed. R. Civ. P. 23(a) and designating their counsel as Class Counsel;

2.     An Order awarding Plaintiffs and the Class restitution and/or disgorgement;

3.      An Order awarding Plaintiffs and the Class compensatory damages;

4.      An Order awarding Plaintiffs and the Class punitive damages;

5. An Order awarding Plaintiffs attorney's fees, expert witness fees and other costs, including pre-judgment and post-judgment interest thereon to the extent allowed by law; and

6. Such other relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the proposed Class, hereby demands a trial by jury as to all matters so triable.

Dated: March 20, 2017                WHITFIELD BRYSON & MASON LLP

/s/ Daniel K. Bryson_____
Daniel K. Bryson
N.C. Bar No.: 15781
J. Hunter Bryson
N.C. Bar No.: 50602
PO Box 12638
Raleigh, NC 27605
Telephone: 919-600-5000
Facsimile: 919-600-5035
Email: dan@wbmllp.com
Email: hunter@wbmllp.com
*Attorneys for Plaintiffs*

*/s/ John D. Hafemann*_____
John D. Hafemann
GA Bar No.: 327982
21 W Park Avenue
Savannah, Georgia 31401
Telephone: (912) 226-6696
Facsimile:  (843) 645-6530
Email: john@mja.law
*Attorney for Plaintiffs*